Young Motor Company, Inc. v. Commissioner.
Young Motor Co. v. Commissioner
Docket No. 62101.
United States Tax Court
T.C. Memo 1964-22; 1964 Tax Ct. Memo LEXIS 316; 23 T.C.M. (CCH) 113; T.C.M. (RIA) 64022; January 30, 1964
Arthur M. Gilman and Walter H. McLaughlin, Jr., for the petitioner. Frederick A. Griffen, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: This findings of fact and opinion is prepared and promulgated in pursuance of the mandate of the Court of Appeals for the First Circuit, Commissioner v. Young, 316 F. 2d 267 (C.A. 1, 1963). The deficiencies involved are in the income tax of petitioner for the calendar years 1950, 1951, and 1952 in the respective amounts of $15,791.88, $10,605.70, and $4,960.90. The sole issue *317 to be decided is whether petitioner was availed of during the years at issue in order to prevent the imposition of surtax upon its shareholders. Findings of Fact We adopt as our finding of evidentiary, as distinguished from ultimate and conclusory, fact our findings as set forth in Young Motor Co., 32 T.C. 1336 (1959), and as set forth in Young Motor Co. T.C. Memo. 1962-135. Ultimate Finding We specifically find, as we have in the last cited opinion, that petitioner's accumulation of profits for all years at issue were not beyond the reasonable needs of its business. The primary purpose for which petitioner's profits were accumulated and not distributed to its stockholders by way of dividends during the years at issue was to prevent the imposition for surtax upon its stockholders. Opinion In the light of the last cited opinion of the Court of Appeals for the First Circuit in this case and the mandate issued in conjunction therewith, we have reviewed the entire record and file herein for the purpose of reconsidering the ultimate factual issue as set forth in our preliminary statement. We approach the ultimate issue upon the accepted premise that petitioner's *318 accumulation of profits for the years at issue was not beyond its reasonable business needs. In reconsidering the ultimate issue we do so with the burden of proof resting upon the petitioner to prove by a preponderance of evidence that it has not been availed of within the meaning of section 102(a) of the Internal Revenue Code of 1939[1] for the primary or dominant purpose of avoiding the imposition of surtax upon its stockholders. We think, as we have ultimately found above, that it has failed to sustain its burden. The record, taken as a whole, in fact leads us affirmatively to the conclusion that petitioner was availed of during the years in controversy for the primary and dominant purpose proscribed by the statute. *319 Although a business need is apparent here, that business need is contingent to a great degree upon a purpose or policy on the part of petitioner concerning which this record is silent. If petitioner had no plan or purpose to retain its Oldsmobile franchise and, incidental thereto, to use its cash surplus to expand its business facilities, such business need cannot be held to be the reason, dominant, primary, or otherwise, for its accumulation. The respondent has determined that petitioner had no such plan. Petitioner has not offered more than conjectural proof to the contrary. It has therefore failed to sustain its burden of proof with the result that respondent's determination must prevail. It is true that on further hearing held in pursuance of the first mandate of the Court of Appeals for the First Circuit, Harry W. Young, petitioner's chief and controlling stockholder, testified that at the time of the filing of the returns for the years at issue and during those years he was not aware of the statutory penalty under section 102 of the 1939 Code. On the basis of the record as a whole, including Young's past experience, we are unable to conclude that his testimony as to lack *320 of knowledge of the applicable law represents a true portrayal of fact. Certainly, he realized throughout the years at issue that he personally was not being required to pay any tax upon petitioner's earnings because they were not being distributed to him. Petitioner's accumulation of profits is not shown by the record to have been motivated by a need to develop larger and more up-to-date business premises. Although the record clearly indicates the fact that this was a business need, it by no means rebuts by any measure of proof the proposition, contended for by respondent, that its accumulation of profits was brought about by the purpose proscribed by section 102. From 1945 through 1952 the petitioner consistently maintained a pattern of conduct the very essence of which was the apparent retention from its stockholders of its earnings. We say "apparent" because the effective use of these earnings was clearly not for petitioner's benefit, but rather for the furtherance, advantage, and betterment of Young's personal equities in his unrelated business ventures and investments. Indeed, this pattern becomes even more clearly delineated in the light of petitioner's rental of Young's building *321 at a rental which we feel justified in concluding was never designed to produce a direct profit to him. Why does an astute businessman carry on a successful business enterprise if it is not for the primary and fundamental purpose of providing a return on his business investment through the distribution to him of at least a portion of its profits? If there is any other reason than the one proscribed by statute for petitioner's incorporation and subsequent accumulation of all its profits through its entire existence, the record does not disclose it. A preponderance of evidence sufficient to sustain petitioner herein we think necessarily requires some proof that petitioner's continuing to accumulate its profits during the years at issue, as it had prior thereto, was not for the primary purpose of saving its stockholders harmless from payment of the income taxes normally imposed upon the receipt of corporate dividends, but rather that it was for the primary and dominant purpose of meeting business exigencies. We have no such preponderance of evidence here. The mere showing by petitioner of a present or prospective business crisis is not sufficient. It must establish that crisis as the *322 motivation for its continued accumulation during the years at issue. We have no evidence in this record of any corporate action on the part of petitioner designed for its protection against its possible loss of its Oldsmobile franchise, to provide financially for the construction and acquisition of an expanded plant, and its use of its accumulated profits for those purposes. Young's testimony taken upon the rehearing herein affirmatively shows that Young felt no inconsistency between petitioner's continuing policy of lending its surplus in increasing amounts to Young and his unrelated enterprises and petitioner's prospective business crisis. He felt so because such loans could be repaid by the borrowers at any time either from their own resources or through Young's very adequate line of credit with several banks. Other than his unsupported statement, however, we have no other evidence leading to this conclusion. We justifiably assume no such evidence is available. As the business of petitioner had been conducted prior to the years at issue we are convinced its profits were never intended to be directly distributed to its stockholders, and the reason for such conduct of its *323 affairs seems, for all that is shown here, clearly to have been the avoidance of any income tax thereon for which its stockholders would be liable. Although petitioner has shown the fact of a prospective business crisis, it has not shown any change in its reason for continuing to accumulate its profits as it had in the past which change can be attributed on the record herein to such prospective business exigency. It is true, as has been found by both this Court and the Court of Appeals, that petitioner's accumulations were not beyond its business needs for the years at issue as its affairs had been traditionally conducted, but it does not follow that for this reason its current accumulation of its profits was for the primary and dominant purpose of defraying possible business expense incident to its acquisition of expanded business facilities or its loss of its franchise. It is because, during 1950, 1951, and 1952, it was still conducting its affairs in the traditional manner and for the traditional reason that it is liable under section 102 of the 1939 Code. The oral testimony and documentary evidence before us present rather clearly a typical picture of the milking of a corporation *324 by its chief stockholder through the siphoning of a portion of its surplus indirectly into his hands by the use of conduits in the form of unrelated corporations and loans directly to the stockholder. The burden of casting a different, more favorable light on this picture rests on the petitioner. It claims to have sustained this burden simply by a showing of a prospective business crisis and the fact that to meet this crisis it needed all of its surplus. As we have indicated above, this is not enough. No showing is made of any definite or tentative corporate plan to meet this prospective crisis. No showing whatsoever is made to demonstrate that amounts paid to Young and his unrelated corporate business ventures were other than indirect distributions of petitioner's profit to Young in a form untaxable to him. These payments were evidenced by demand notes without interest until 1952, but no demand is shown to have been made or contemplated for their payment during the years at issue even though petitioner was faced with what its chief and controlling stockholder claims to believe was a business crisis. Petitioner, through its chief stockholder, lays great stress upon the riskiness *325 of its automobile dealership business as being one of the paramount reasons for its accumulation of surplus. He points to the Korean war period as an example of this risk. While we think the business was subject to risk in an ordinary degree, we do not understand that the fluctuations of business due to war emergency can be said to be petitioner's reason for such accumulation. Young's own testimony points this up. When asked on corss-examination for specific instances of meetings of petitioner's board of directors in which petitioner's necessity for maintaining a liquid cash condition was discussed, Young testified: We looked at that as a broad picture, '50, '51, '52. We had no idea that Truman was going to have a set-to with the Koreans; and we had no idea of that. * * * Obviously petitioner's accumulation during the years at issue was for reasons other than anticipated business difficulty during and due to the Korean hostilities. This is not only a failure to bear its burden of proof, but affirmative evidence to the contrary. We note also that, according to the testimony of Young, the necessity of acquiring business facilities in accordance with the requirements of Oldsmobile *326 could not have been petitioner's reason for its accumulation in the years at issue for it was not until 1953 that such requirements were made known. At that time Young clearly indicates his surprise and shock at the magnitude of the Oldsmobile requirements. We take it from this that, assuming a purpose to retain the Oldsmobile franchise and to obtain an expanded plant, petitioner had not, during the years at issue, planned to do so to the extent required by Oldsmobile. It is true that in years subsequent to those before us petitioner needed increasing cash with which to carry on an expanding finance business relating to the sale of automobiles, but to say that this was its reason, primary or otherwise, for its 1950, 1951, and 1952 accumulation is to belie the record for it is there clearly shown that petitioner's financing of such sales was lessened by the dearth of automobiles available for sale during the Korean war and, beginning prior to these years, such transactions became greatly decreased in number due to the advent in Springfield of credit unions and the entry of banks into the autofinancing field. Indeed, during each year at issue petitioner's finance business progressively *327 decreased. During 1950, 1951, and 1952, the record affirmatively shows, petitioner's reason for its increasing accumulation could not reasonably be attributed to its finance business. During 1950, 1951, and 1952 petitioner cannot be said to have been particularly influenced in its accumulation of its profits by a lack of cash generally, for its loans to Young and his unrelated businesses increased in each year to an average for the last 2 years of that period of about $186,000. This fact is inconsistent with the contention advanced by petitioner that it was overly influenced, in fact "pressured" by Oldsmobile to acquire expanded facilities. It is clear from the record that there was no immediacy to these requests by Oldsmobile until November 1953. We note also in this respect that petitioner's proof does not support its contention that loans made to Young and his unrelated businesses were liquid, readily callable and in essence therefore the same as available cash. The record does disclose that this was true in 1957 upon petitioner's obtaining a Ford franchise, but the proof required here must relate to the years at issue in order to be effective. So far as Young's real estate corporations *328 are concerned the record will support only a conclusion that during the years at issue these assets were principally real estate and no showing is made as to such assets being readily convertible to cash. No showing whatsoever is made with respect to Young's ability, except through bank credit, to repay loans to him during these years. Petitioner's purchase of securities and its retention thereof throughout the years at issue are inconsistent with its claimed need for cash during those years. Its earned surplus on January 1, 1950, was $216,938 and increased during 1950 to $273,446, during 1951 to $308,833, and during 1952 to $322,875. Even though these amounts may have been consistent with the needs of petitioner as it had been carrying on its business since its inception (i.e., the financing through increasing loans of Young's unrelated business enterprises), we do not think they were retained in petitioner because of any certainty on Young's part during those years or because of any fixed plan or policy on petitioner's part which was based on Young's or petitioner's then determination to maintain the Oldsmobile franchise. This record, taken as a whole, adequately supports the contrary *329 conclusion that neither had ever formed any plan or policy; that until August of 1953 when Oldsmobile's requirements for an expanded plant were made known, petitioner had no such plan or policy and subsequently refused to comply with the requirements and abandoned its Oldsmobile franchise completely. It seems to us noteworthy that, Young having for years been involved rather extensively in the real estate business in Springfield, had he ever formed a policy or plan of accumulation of cash for petitioner in the years before us for the claimed purposes, such plan would have readily borne fruit in petitioner's acquisition of land upon which to construct a new plant during that period. This strengthens our conclusion that the primary or dominant reason for the accumulation was not the business needs of petitioner. The issue here decided is one of fact which at best, being one of motivation and intent, is of more than ordinary difficulty. In the present posture of the case such difficulty is magnified. The intent and motivation of petitioner cannot be separated from that of Young, its controlling and managing stockholder, petitioner's chief witness. We must rely strictly upon the printed *330 record and exhibits introduced at the hearings hereof in reaching our decision. Without a preponderance of proof of Young's motivation in causing petitioner's complete and continued accumulation of its profits, we are left merely to conjecture whether its accumulation of its profits, being within its business needs during the the years before us, this need or the purpose proscribed by section 102 was the motivation therefor. This is not enough to overcome the presumption of correctness of respondent's determination of deficiency. Decision will be entered for the respondent. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000 plus 38 1/2 per centum of the undistributed section 102↩ net income in excess of $100,000.